Good afternoon, Your Honors. Devin Burstein from Federal Defenders. On behalf of Mr. Martinez, earlier this morning, Judge Pragerson said that sometimes, sometimes wisdom comes from hindsight. I think that was the quote, because I wrote it down. And I think that applies to this case, because on the record. Yes, absolutely. I'll write it down and email it right away. And I think on the record before this court, even looked at in a light most favorable to the government, clearly there's not a preponderance of the evidence demonstrating that Mr. Martinez was competent here. Really what we're talking about is his ability to meaningfully assist in his own defense. Was he just a homeless man wandering back and across the border? Because it seems like he's been tried for this offense or less for this offense. This was his seventh one. Many times. This was, right, his seventh immigration-related contact. And it seemed like that was the nature of it, that he's homeless. He did speak English and Spanish to some degree, and that he just kind of was wandering. And I think a lot of that has to do with his mental state, with his numerous disorders that were noted. And I guess we begin, right, with the initial competency hearing. And what we know in Hoesky, from this Court's decision in Hoesky, is when there's two competency experts and they essentially agree on their diagnosis, what's wrong with the individual, which is the case here, that that's not enough. The government doesn't need its burden under those situations because, as this Court determined, it's clear error in that situation for the court to give greater weight to one expert as opposed to the other expert. Well, here are some other things, though, that are in the record, and I don't know what place they have in the analysis. But there was a status hearing a few weeks before the competency hearing in which defense counsel said, I don't believe it's a competency issue. She was saying that she thought it was more just not being that cooperative or really not being helpful in some way. And the people who questioned the defendant at the time of his initial arrest described someone who, you know, he knew who his parents were. He knew his date of birth. He was acting like a relatively competent person. He's been – this is his seventh one. There's no suggestion that in the previous six he was incompetent. Let's make that incompetent. He was. He was, in fact. He was. I guess he was before. Judge Rhodes? Right. It just seems like there's evidence. I guess what I'm saying is that there's evidence both ways, and the judge had the opportunity to observe the person, and we don't have that. So don't we give a little deference to that in when the judge is deciding between the experts? Would it help me to address each one? So the first thing I think you mentioned was Mr. Martinez's initial attorney, and that was Ms. Lopez, not his trial attorney. And I think what happened there is she went in for the initial visits, and I'm sure, as Your Honors are aware, these take place very, you know, relatively quickly, and she had problems communicating with him and put it on for status for a counsel saying what's going on, which is a typical strategy for a defense counsel because sometimes you just have people being hard and we're able to use the magistrate judges or the district judges to kind of assist in the communication almost as a mediation, say, look, these people are working for you. So that's the first thing. Then the second thing Your Honor just brought up was the ability to communicate with the officers. But there's no allegation, we're not contending that he doesn't have an ability to have basic communications. Nobody has indicated that. So it's really his ability to meaningfully assist with defense counsel. And the third thing I asked about, though, may be the most important, which is the trial judge's own observations that we can't duplicate. Right. And I think that's actually a really important point. And, you know, as I was going through preparing for this argument, I just kind of drew a line down the middle of the page, and I said competent and incompetent, and was going through the evidence for myself, almost like a pro and con list that you might make at home. And the third thing I put is the court's observations. Because those observations were that he, Mr. Martinez, was smiling, laughing, in a kind of odd and inappropriate manner. And what those really go to, from a lay judge, that might look like, wow, he's playing games with the court. But really, when you read the reports, that's a specific part of disorder noted by two Ph.D.s who interviewed him, that both Dr. Armenta and Dr. Heller noted specifically that he demonstrated this odd, they believe, I think they used the word, jovial behavior. He could be describing the most painful circumstance in his life or insulting the doctor, and he would do it smiling and laughing. Well, that doesn't necessarily make him incompetent to assist in his own defense, though. Well, I think that it would. I think that the defendant might act somewhat inappropriately in court. If that were all it took, there would be a lot of incompetent defendants. I think that's an excellent point. But that's not, certainly not all we have. That's just one piece of a very large pile of evidence demonstrating incompetency. And what we have, I think, primarily, even if this were a case where the judge could credit one expert above the other, and it's not. Under Hoesky, that's clear. Because Dr. Carroll specifically states a number of times in the record that he agrees essentially with the diagnosis, and that's on page 79 of the ER. And he even says he's not disagreeing about the possibility of head trauma or a psychotic disorder. They both note the borderline intellectual functioning, borderline of mental retardation. But even if this were a case where the judge would be entitled to credit one above the other, it's certainly Dr. Heller. I mean, what do we know that Dr. Heller spent seven ---- How long had it been since Dr. Heller had examined the defendant? A few days. She had examined him initially on two occasions in the 2000 case where he was found incompetent. There's no indication that anything has changed since then. Just wanted to make that point. But then she examined him again right before the competency hearing. She spent a total of seven hours, in her estimation, that's at 161 of the record, with Mr. Martinez, as opposed to about an hour from Dr. Carroll, which always indicates about an hour to me always means slightly less. But we know that Dr. Heller conducted a battery of tests over several years, the initial ones, and then redid the tests. We know that she reported that he was saying that birds were telling him things. She reported an incident where he was talking about the Ku Klux Klan trying to recruit him. She talked about the odd jovial behavior I had mentioned. She talked about, and this I think is really crucial here, that there's no malingering, because everybody says there's no malingering, Dr. Heller, Dr. Armenta, and even Dr. Carroll, says no evidence of malingering. So if he's not playing games, then his conduct really demonstrates somebody who is less than competent. Her then testimony is backed up and her opinion is backed up by Dr. Armenta, who also notes the jovial behavior, the not malingering. And he even says that Mr. Martinez reported that police were trying to use mind control techniques on him. Those are just the experts, but it goes way beyond that. And most importantly, perhaps, is you have counsel. An officer of the court keeps saying, again, from the beginning, this is Mr. Demick, trial counsel, from the beginning all the way up through the sentencing, he is not competent. He is not assisting me. It's irrational. I can't have a rational conversation. He can't help me with cross. He can't help me pick a jury. It's either irrational or a non sequitur. I mean, these are the comments he's making to the court. And then you have Mr. Martinez. On top of everything, you have Mr. Martinez. And what do we know about Mr. Martinez? He refuses to dress out. You have Judge Burns offering his own clothes from his chambers. Well, I could certainly imagine reasons other than incompetence why someone would not want to change out of the jail clothes. They could be angry. They could be just uncooperative. They could be intentionally injecting error. I'm not saying that that's what happened here, but it doesn't, again, necessarily equate. Your Honor, I think what Your Honor keeps getting to is the point is, look, we could pick apart each one of these things, and I think you would be well justified saying not on this alone you don't need to find incompetence. You know, I can't take issue with that. But what I'm trying to draw here is the entire scope, all the circumstances here. And so the refusal to dress is one of them. And then we go to the direct testimony. And that's very similar to Wachowski. I mean, essentially you have, I don't know, I guess, over and over again, repeated references to producing what he eats while the government doesn't produce what he eats, what they eat. I'm not sure what that means. Then we have cross-examination where the insistence about him living on the ground testifying, I live on the ground, my house is on the ground. This thing about being part Native American. And then at sentencing, I mean, I think he says, this might be paraphrasing, I just want you to know I don't know what you're talking about. And then we have, again, the court's observations of his odd behavior, his smiling and laughing, which is what the court was told about by the doctors as part of his disorder. So when we go through on my little list here, I have doctor on the one side for incompetence. I have Dr. Heller. I have Dr. Armenta. I have all the statements by counsel, which we know are some of the most reliable evidence. Because you don't want to comp your client and send them off to a hospital if they're, I mean, this is not the greatest outcome. Yeah, that's what I was going to ask about. So if he were found incompetent to stand trial, then he gets, instead of standing trial, he goes to the mental hospital. Right. And then they are allowed to treat him to the point where he gets competent and then he goes to the mental hospital. Which is what happened the last time. So he has the time when he's in the mental hospital plus all the time he's in prison. Which would be what? Yeah, he'd be sent to the custody of the Attorney General. And, you know, Your Honor makes a really good point that I almost forgot, and I'm really glad you did, that you just brought that up. Because, and this goes back to the Supreme Court's case in Cooper. What are we looking at here? What's the harm? The harm is so severe to trying someone who's incompetent to that person. As opposed to on the government side, sending them for treatment, giving them that presumptive four months. Well, and taking them off the meth. Yeah, I mean. I mean, obviously he was taking. That's in the record, right? He started sniffing glue at 13 and has been a daily meth user ever since. I mean, really, Cooper instructs us, look, if we're going to make an error here, if it's even close, and I don't think it is here, we have to err on the side of sending these people for treatment and not trying people who are incompetent. Because the harm to the government is really none. I mean, they're supposed to be seeking justice, not jail time. Well, I wonder why they would let him. I mean, if he was really incompetent, why they'd want to put him in jail. Yeah. It would create a lot of trouble. It's, yeah. We wonder that a lot. What is his IQ, exactly? It's under 70. Yes, it fluctuated, I think, between 68 and 70, less than. He was in the bottom two percentile of the entire population. Borderline mental retardation, again, everybody agreed on that, including Dr. Carroll, who specifically stated the borderline intellect, and that's on page 80 of the excerpts of record. I see I've gone over a little bit. If there are further questions, I'd be happy to address them after the government's argument. Thank you very much. Thank you. Good morning. May it please the Court. My name is Caleb Mason. I'm Assistant United States Attorney representing the government in this case. I'd like to start with the law, if I could, specifically the Hoske case. The defendant relies heavily on Hoske. Hoske does not, however, stand for any sort of a general proposition that where experts generally agree about diagnosis, the district court is bound to rely on the defense expert. Hoske is an example of precisely the kind of case-by-case, fact-specific inquiry that the district judge engaged in in this case. And in Hoske, Hoske is actually a very interesting case. The Ninth Circuit in Hoske noted two very clear errors, neither of which was present in this case. The first of those errors was that the court's ruling, the district court's ruling in Hoske was based on the court's perception that the defendant was dangerous, not on whether he was confident. And the district court in fact said that in Hoske. If we turn to page 1391 of the Hoske opinion, excuse me, we find the district court saying, asking the parties to reach an agreement on institutionalizing the defendant and dropping the criminal charges, asking them if that's possible and saying, I'm concerned that he's perfectly capable to go back to the Indian Reservation to go kill somebody on the highway or assault them or rape them. So that is the bottom line. He asked the parties twice if they would reach an agreement to drop the charges and institutionalize the defendant. And he said again at sentencing that his main consideration was the defendant's dangerousness. Now, that's the wrong standard. That's not the competency standard. And that's what the Ninth Circuit pointed out in this case. At 1394 of Hoske, the Ninth Circuit, this Court, held that our finding of clear error turns in part on our sense that the district court itself was not convinced that Hoske was competent, but was unwilling to find incompetency in light of its firm conviction that Hoske posed a danger to society. So that is the first error in Hoske, not present in this case in any way, shape, or form. The second error in Hoske was that the examining psychologist in Hoske had applied the wrong standard as well. If we turn to the next page, now 1390, this is 1393 and 4, the Ninth Circuit held, Dr. Grossman's conclusion that Hoske was competent rested in significant part on his observations of Hoske's ability to function on a daily basis. In other words, this Court held, what the expert had testified to in Hoske was not an application of the correct legal standard, which is Hoske's ability to meaningfully assist his counsel. Rather, the expert had testified that Hoske was able to function in his daily life on the reservation, driving a truck, et cetera. Sotomayor, why don't you turn to the facts in this case and why there's not clear error, because clearly this person has significant deficiencies in his intelligence, in his orientation to the world, and his abilities. In this case, Your Honor, both of the experts agreed that the defendant was not retarded and neither of them diagnosed him with a mental illness. The experts agreed that his intelligence was low but not mentally retarded nor mentally ill. The government expert and the district court made a big deal of this. Well, you know, at trial, he insisted on wearing his prison uniform. That's correct, Your Honor. Let's just go through this. And I don't remember, I think maybe once before I remember a prisoner that insisted on it. And he smiled and laughed during the trial at an inappropriate time. And he had delusions that birds spoke to him and that the KKK communicated with him by writing in the sky. And he had serious memory problems. Difficulties understanding directions. Unable to remember very basic information such as his own age. Not able to rationally work with his attorney in terms of providing information that is relevant. Serious attention and memory problems. A whole laundry list here. Yes, Your Honor. The district court asked defense counsel about this. So why not just try again and see if we send him to a facility where he gets some treatment. Maybe it's not going to work. It didn't work in the past. May I direct the court's attention to page 87 of the excerpt? Part of our jurisprudence is that you don't, he's not a danger to anyone, is he? This defendant has a long criminal history. It is property crime. He breaks into vehicles, according to the criminal history report, and steals property. I'd like to kind of still get an answer to my question about what evidence in your view supports that there's no clear error. Yes, Your Honor. Which is your position, in spite of the bizarre behaviors and so on and so forth. If we could turn to page 87 of the excerpt of record. This is part of the colloquy in which the district court engaged defense counsel about precisely what it was about Martinez's behavior that rendered him incompetent. The district court asked defense counsel to address this. And this is, in the middle paragraph, this is what defense counsel said. That's sort of what I was getting there at the end is we know it's not a nonviolent crime. That's not a defense. I can't argue that to a jury. I can't argue that he was born in the United States. He retracted that. The evidence is manifestly contrary. When it comes down to really discussing a defense, I don't think he has the ability to give me any factual assistance as his attorney. What defense counsel told the district court was that the answers he got from the defendant were not legal defenses to the crime. That's precisely what the government expert, Dr. Carroll, testified to as well, that the defendant's beliefs, the defendant's beliefs that he held very strongly were that he was an American Indian, that he had a right to be in the United States because of that, that it should not be a crime for him to come to the United States, that he should not be punished for coming to the United States because his behavior was nonviolent. Those are not, as the district court pointed out, irrational in any way, shape or form. But that's not all there was in the record, certainly. There was the expert evidence and the strange behavior and all of that. Well, the judge did not actually make the statements, as defense counsel suggested, that the defendant's behavior in court was inappropriate. In fact, the judge repeatedly said precisely the opposite. Well, he really tried very hard to get the defendant to put on some street clothes. He said that was inappropriate, clearly. Well, when the defendant refused to do that, the judge made some comments about it. He said, I find this to be bullheaded, perhaps belligerent, perhaps not in his best interest. But he said there – Everyone knows that wearing jail garb implies guilt. What defendant who had been advised of that would wear the jail garb in his trial? It's like saying, convict me. Well, Your Honor, this defendant had, as a matter of principle, and he expressed this through his attorney, that he would not wear clothes that did not belong to him. He stated that that – this is what his attorney told the court. Right. Or did the jail garb belong to him? Well, perhaps it did in the sense that that was clothes that had been issued to him in the jail. I don't know, Your Honor, but I know that the defendant's answer was – Yeah, it sounds a little crazy, doesn't it? I mean, he's not really wearing clothes that belong to him. Well, Your Honor, he also insisted that he had the right to be in the United States because it's an American Indian. Maybe he really believes that. Precisely, Your Honor. And I think that's an important point. Which is awesome. His defense counsel identified that as a delusion and, in fact, presented it to the court as a delusion. But if we look at what the defense expert herself said, the defense expert herself at page 239 of the record stated that that belief might have some basis in reality. Well, everyone agreed that he was not malingering, but the district court didn't believe that, right? The district court believed that he was playing games with respect to his language knowledge, that he actually probably did speak English. And, in fact, that was confirmed by his own defense attorney, Mr. Demick, who, before the end of the trial, told the judge not to bring the interpreters back for future proceedings because his client did not need them. So that turned out to be true. The district court was right that the defendant did, in fact, speak English and did not need the Spanish language interpreters. And that was the point at which the – that was the only point on which the judge specifically suggested that the defendant was malingering or playing games. As it turns out, the judge was right. The problem, as the district court identified in the long colloquy that goes on from about page 86 to 94. It's not uncommon for someone who speaks Spanish and a little English to have an interpreter. That's correct, Your Honor. The point I was making – How far did he go in school? This defendant? Yes. He did not go very far in school, certainly no farther than elementary school. He stated that he learned his English – this is in the pre-sentence report. He stated – or I'm sorry, in the psychological reports. He stated that he learned English and Spanish because he grew up, you know, traveling around both sides of the border. That he was from Mexico, but he had learned his English, I believe, on the streets was what he said. But the judge made repeated observations that the defendant's demeanor and conduct in the courtroom was not abnormal. That he was communicating meaningfully with defense counsel, that he was following, paying attention, that he would shake hands with defense counsel, he would answer questions when defense counsel put them to him. What the judge instead suggested, and I think the record bears this out, is that defense counsel's complaint was fundamentally that the defendant didn't tell him anything that constituted a defense to the crime. What this defendant said was, it's not fair to punish me for merely crossing the border. I'm not doing anything violent, and maybe I'm an Indian. Why don't I have a blood test? The defendant's own expert said this on page 239, that perhaps a blood test could identify whether the defendant really is an American Indian. It's at least possible that such a blood test could have been done, could have been shown to have some membership in a tribe. I don't know. But the judge in this case, the district court, said that might be a rational defense, and certainly it's not irrational in any kind of psychological sense. It might not be a good legal defense. Maybe 1326 shouldn't be a crime. Maybe we ought to change our immigration laws. Many, many people in this country believe that. That's essentially what the defendant was stating. And the district judge recognized that. He said there are lots of people who believe that. It's not currently a legal defense, and it's not insane or irrational or incompetent to think that your conduct should not be a crime. Now, the – I see that I have – that I have run out of time. I can briefly address any concerns about the criminal history finding that the Court may have. I think it is adequately addressed in the papers, and I would just direct the Court for the record to two pages of the excerpt of the record, pages 143 and 151. And I would note that in those two complaints, there is a booking number listed for the defendant at the bottom of each complaint. Those booking numbers are different. The defendant got one booking number for the first complaint, one booking number for the second complaint, and the only way that could happen is if the defendant was arrested twice. Excuse me, Your Honor. I missed the last few words. The – there are two criminal complaints. I heard that, just the last. The only way that a defendant could have two separate, distinct booking numbers is if the defendant was arrested twice. You only get one booking number for one arrest, and he has two for these two. I suppose. Yes. Okay. All right. The matter is submitted, and the Court will, for this session, adjourn. All rise for the second and the third.
judges: Pregerson, Graber, Wardlaw